## UNITED STATES v. 1013 CRATES OF EMPTY OLD SMUGGLER WHISKY BOTTLES AND OTHER PROPERTY (GLICKSTEIN & TERNER, Inc., Claimant).

### No. 2374.

District Court, E. D. New York.

June 14, 1930.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Nelson H. Carver, Sp. Asst. to the Atty. Gen., and J. Bertram Wegman, of New York City, of counsel), for the United States.

Harold L. Turk, of Brooklyn, N. Y., for claimant.

BYERS, District Judge.

This is a libel proceeding instituted by the federal government against the res particularly recited in paragraph fifth of the libel.

The property consists of sundry crates of empty whisky and gin bottles, bundles of paper cartons bearing the names of various brands of whisky, gin, etc., and empty wooden boxes bearing the names of various whiskies, gin, and rum.

These articles are alleged to have been unlawfully used in violation of title 2, section 25, of the National Prohibition Act (27 US CA § 39). Glickstein & Terner, Inc., a corporation, is the claimant of said property.

The proceeding came to trial before this court on March 19, 1930, under stipulation embodied in a letter from the claimant's attorney to the undersigned, written on March 10, 1930, the presently material portion of which is as follows:

"* * * I am willing to stipulate on behalf of my clients in open court, pursuant to the Government's offer last Wednesday, that the only question for the court to determine is that of search and seizure. If the search and seizure are held to be legal, I am willing to stipulate that a decree be entered forfeiting the property. The right of appeal, however, is not to be waived. * * *

"A copy of this letter is being delivered to Mr. Ameli (the U. S. Attorney)."

In order to determine the facts as to the search and seizure, considerable testimony has been taken which, for present purposes, may be summarized as follows:

Joseph L. V. Treglia, a special agent of the Bureau of Prohibition of the United States Treasury Department, visited the premises of the claimant on February 6, 1929, following an investigation which he had personally made at Woonsocket, R. I., immediately prior thereto; he was accompanied by an individual by the name of Samuel

Freede, who took him to the office of the claimant, and there introduced him to one Jack Terner; the latter occupied a private office adjoining that of Mr. Edward Glickstein, whose office communicated with that of the said Jack Terner; the latter's legal status as a representative of the corporation is not clear, but Edward Glickstein, the chief executive, had knowledge of, and ratified, Jack Terner's activities here involved.

Said Freede introduced Treglia to Jack Terner as a bootlegger who intended to make up some William Penn whisky and was in the field to buy some barrels, bottles, labels, and other paraphernalia for the making up of that whisky.

Terner said to Treglia, according to the latter's testimony: "We have such articles on the premises and would be glad to sell them to you."

Treglia's statement to Terner was: "That I was a bootlegger, that I intended to make up some William Penn whiskey and that I was in the field to buy some barrels, bottles, labels, and other paraphernalia for the making up of this whisky," and it was in reply to that announcement that Terner made the answer first above quoted.

The barrels were empty Overholt whisky barrels, that is to say, barrels in which Overholt whisky had been aged and the interior of which, being charred, had absorbed certain elements during the process of aging the whisky, which were contained in the charred substance when it was removed from the barrels; this charred substance is technically known as "chips."

When the chips are treated with alcohol, a colored substance is the result, which, in certain circles, passes for and is known as whisky.

At the plant of the claimant, the empty Overholt barrels were "shaved"; that is to say, the interior charred surface was removed and the shavings from three barrels were ordinarily put into a fourth barrel, and the latter was then known as a "unit." Another quaint name for such a barrel is "four in one."

The agreed price of such an empty Overholt whisky barrel, containing the chips or shavings from three others, was $132.50, and the sale of three was arranged between Terner and Treglia at this figure, and, in addition, the following other merchandise: 100 dozen Lawson outfits; 100 dozen special outfits; 100 dozen Teachers special outfits; 100 dozen Overholt pints, complete, new; 100 dozen William Penn pints, complete.

An outfit is a bottle containing the name of the whisky supposed to be purveyed in it, the cork, the label, the wrapper, and neck stamps, and what is called a "strip stamp," which will later be referred to.

The names "Lawson," "Teachers," and "William Penn," as well as "Overholt," are the names of brands of whisky, and the labels, corks, wrappers, etc., are so printed or stamped.

The article known as a "strip stamp" is a gummed strip of paper, printed in more or less accurate simulation of the government stamp, and, from those offered in evidence, it is quite obvious that a person not reading the printed matter contained on the so-called "strip stamp" would erroneously assume that it was a government stamp; whether such an article is properly called an imitation or a counterfeit matters little for present purposes; the mission of such a document is to create the impression, on the part of the purchaser, that what purports to be a bottle of whisky is an authentic product upon which a governmental stamp has been placed.

The purchase price of this assortment of "units" and "outfits" was $1,200, of which $200 was paid on February 7, 1929, through a telegraphic check or order addressed to Treglia apparently by one, Forcier, of Woonsocket, R. I.; whereupon the order was shipped to the latter place and there delivered to Treglia on February 9th. Incidentally, $125 was paid to Freede, who introduced Treglia to Terner and Glickstein, being the amount of his commission for so officiating. The commission was paid by Edward Glickstein; that is to say, he signed the check.

Treglia further testified that, while he was negotiating his purchase, Jack Terner took him into the label room, containing the labels which Glickstein & Terner, Inc., dealt in, namely, labels for whisky, gin, brandy, and other alcoholic stimulants, and Terner informed Treglia that he supplied bootleggers with that material, and never had "any kick come."

On February 7th, Treglia had a conversation with Glickstein on the subject of stamps, so-called, and Glickstein explained that they were not easy to get. His exact words, as quoted by Treglia, are as follows:

"Yes, sir, he said, he stated they were hard to get and the Government was after him and he said, you fellows make money and you want us fellows to fight your battles for you. * * *

"He said that the Government would indict him for conspiracy if he did."

At the time of this conversation, Treglia had procured some stamps, but not the kind that he wanted. Treglia, under the assumed name of Lyons, dealt with Jack Terner, Edward Glickstein, and an individual by the name of Brecker.

All of the foregoing facts were made known to George E. Golding, special agent in charge in the Field Service of the Bureau of Prohibition, who was the superior officer to Treglia.

Being thus apprized of this particular activity of Glickstein & Terner, Inc., Golding, on February 11, 1929, visited the plant and arrested twenty-two persons, including Edward Glickstein, Jack Terner, Herman Brecker, and others, being accompanied by Special Agent Treglia, a police captain and two police lieutenants, and a number of police detectives; in connection with the arrest, he seized the articles comprehended in the libel, and he searched the files, desks, cabinets, and safe, etc., and seized certain papers and records.

It is Golding's testimony that these seizures were made as incidents of the arrest, and without a search warrant, and that there was no warrant of arrest.

It should be stated that the government contends, and both Golding and Treglia testify, that all of the property contained in the plant of Glickstein & Terner, Inc., was seized on February 11, 1929, and the seizure, therefore, embraced the articles enumerated in the libel; also it embraced numerous items, in very considerable quantities, of personal property, such as empty unidentified bottles of various shapes, and bottles and glass containers such as are usually employed in connection with the sale of many household articles which are quite foreign to alcoholic beverages. In other words, a large volume of the claimant's business involved the sale of bottles and containers not suitable for the use as containers of alcoholic liquors.

On February 13th, seven, and on the 14th, four, truck loads of miscellaneous items, consisting of labels and empty whisky barrels and similar things, and being a part of the articles seized, were removed in government trucks, and it is conceded that none of the property so removed was used unlawfully.

On February 14th, an order to show cause, containing a stay, was obtained by the claimant from a judge of this Court, and served upon the agent in charge of the property, which was apparently returnable on February 15th, and Treglia appeared in court on that day, and, in answer to questions propounded to him by the judge presiding, stated that he (Treglia) had removed all the property of the claimant from the plant, that he wanted; he was orally instructed by the judge presiding not to remove any further property from the plant of the claimant without a search warrant, so that matters might rest in status quo until the decision of the motion, which ensued on March 14, 1929.

On February 21st, the said agent Golding applied to the United States commissioner for a search warrant, and the same was issued to him on that day, and it was executed on February 25th, and the property described in the inventory attached to the warrant was seized on that occasion.

That warrant was the subject of controversion, and, by order of the commissioner entered after the hearing in the instant proceeding, the said search warrant was quashed, vacated and set aside. In this connection, it should be stated that the position of the libelant is that said warrant was at all times a nullity and the seizure thereunder did not give rise to the government's claim in this proceeding.

The determination herein to be made will proceed on that theory, which means that, if the search and seizure of February 11, 1929, was valid, the libelant must prevail, and, if not, judgment must be awarded to the claimant.

The contentions of the claimant are that the arrest made by Golding on February 11, 1929, was illegal and, consequently, the search and seizure which were incident thereto must be regarded as having no force and effect. The case of United States of America v. Gowen, et al., 40 F.(2d) 593, decided by the Circuit Court of Appeals for the Second District on April 14, 1930, seems to dispose of this question, so far as the authority of Golding is concerned, provided one or more of the persons so arrested had, in fact, committed a felony and Golding had probable cause to so believe.

It must be quite clear that the transactions of February 6, 1929, involving the purchase of the barrels of chips and the empty whisky bottles and labels and other paraphernalia from the claimant by Treglia, acting under an assumed name, were an integral part of a felony, namely, a conspiracy to manufacture and sell alcoholic liquor in violation of the Prohibition Law. The manifest purpose of the purchaser and seller could be nothing else.

Golding had probable cause to know of this violation, through the report that Treg-

lia had made to him; if Treglia's report had not convinced Golding that Glickstein & Terner, Inc.'s participation was part and parcel of a conspiracy to violate the law, originating in the purchase by it of the empty whisky barrels, then Golding would not have possessed the requisite intelligence to discharge the functions of his office.

Much is made, in the claimant's brief, of the contention that the mere sale of empty whisky bottles, labels, wrappers, corks, and other paraphernalia, ingenuously called "outfits," was not a part of the manufacture of alcoholic liquors in violation of the Prohibition Act.

Under date of May 5, 1930, that contention was disposed of by the United States Supreme Court in the case Danovitz v. United States of America, 50 S. Ct. 344, 74 L. Ed. 923.

It will be recalled that the sale made to Treglia by Glickstein & Terner, Inc., was not only of empty bottles, labels, etc., but three so-called "units," being empty whisky barrels containing chips in each instance from three other barrels; and to attribute to Glickstein & Terner, Inc., an innocent purpose or a lack of knowledge of the actual purpose for which the purchase ostensibly was made, would be to reflect upon the intelligence of those who were conducting that enterprise, and the credulity of the court examining into the facts.

It is concluded, therefore, that the arrest made by Golding was legal within the rule of decision of Marron v. United States, 275 U. S. 192 at page 198, 48 S. Ct. 74, 72 L. Ed. 231, and that the search conducted and the seizure made by him in connection therewith should be upheld for present purposes.

No evidence was offered on the part of the claimant, and, in thus disposing of this litigation, the court has confined itself to the intent and purpose of the stipulation, and the subsequent pleas of "Guilty" by certain of the officers of Glickstein & Terner, Inc., to the conspiracy charge, which have been entered since the submission of this controversy for decision, and the plea of nolle pros. entered against the corporation itself, while known to the court in the practical sense, have not been considered in the disposition of this controversy; nor has it been deemed expedient to comment upon that which has been complained of by the claimant concerning the manner in which the prohibition agent and his assistants are said to have discharged their duties on February 11, 1929, and immediately thereafter.

One way to test the argument touching these incidents is to consider what would have happened if Golding had been armed with a search warrant on February 11th, describing the articles listed in the libel, and, in executing that warrant, had seized all the property of the claimant; that is to say, all of the chattels, books, records, and other paraphernalia referred to in the claimant's argument and described in the testimony given under cross-examination by both Golding and Treglia. In that event, it would seem that the actions of the agents would have come within the decision in the case of McGuire v. United States, 273 U. S. 95, 47 S. Ct. 259, 71 L. Ed. 556.

Should a different rule apply because, in this case, the agents acted without a warrant? No good reason is presented which would sustain such a conclusion.

Under the circumstances here related, the seizure of the articles listed in the libel is held to have been lawful, whether with or without a search warrant, and, even though it be true that other articles were taken the seizure of which could not be justified in a legal sense, the agents did not thereby invalidate such of their proceedings and activities as are held to have been lawful.

A decree of forfeiture in accordance with the prayer of the libel may be entered.